UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPHINE HAVLAK PHOTOGRAPHER, INC.; JOSEPHINE HAVLAK; WILLIAM JOSEPH HILL; and MARY KATHERINE HILL, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:15CV00518 AGF |
| VILLAGE OF TWIN OAKS; KATHY RUNGE, Village of Twin Oaks Clerk/ Controller; and ST. LOUIS COUNTY POLICE CHIEF JON BELMAR, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

This action for declaratory and injunctive relief is before the Court for a decision on the merits, following an evidentiary hearing held on April 27, 2016.  Plaintiffs Josephine Havlak Photographer, Inc., and Josephine Havlak seek (1) declaratory judgment that a municipal ordinance of the Village of Twin Oaks regulating commercial activity within Twin Oaks Park is an unconstitutional prior restraint on their engagement in commercial photography, which they maintain is protected First Amendment activity, and (2) permanent injunctive relief against Defendants' enforcement of the ordinance.[1] Defendants are the Village of Twin Oaks ("Village"), Village Clerk/Controller Kathy Runge, and St. Louis County Police Chief Jon Belmar.  For the reasons set forth below,

---

[1] The Court previously dismissed the claims of Plaintiffs William Joseph Hill and Mary Katherine Hill for lack of standing.

the Court concludes that even if the commercial photography at issue is expressive speech covered by the First Amendment, the ordinance in question passes constitutional scrutiny.

## BACKGROUND

Josephine Havlak Photographer, Inc., is a corporation offering commercial photography services, focusing on wedding and portrait photography.  Josephine Havlak, a professional photographer who takes all the photographs on behalf of Havlak Photographer, Inc., is the sole corporate officer and director of the company.  Plaintiffs believe that Twin Oaks Park is an excellent place to take photos of their clients, such as wedding groups and high school seniors.  The Park is approximately 11 acres in total, including a lake, a playground, a basketball court, and a wooded area.  The area that commercial photographers, such as Plaintiffs, tend to use for their work is a small area in which there is a waterfall and a small picturesque wood bridge spanning a creek.  This area is also the most popular area for other patrons of the Park.

Plaintiffs initiated this lawsuit in February 2015.  At the time, the Village had an ordinance that prohibited use of the Park for commercial purposes, and posted two signs in the Park that stated, "No commercial activity, including commercial photographers." On June 17, 2015, the Village passed Ordinance No. 459, which superseded the previous ordinance and provides, in relevant part, as follows:

> *Regulation of Solicitations and Commercial Activities.*  Solicitation of any business  or  service  is  prohibited.    No  person,  firm,  or  corporation  is permitted to offer or advertise merchandise or other goods for sale or hire. Excepting  Village-sponsored  events  and  activities,  the  maintaining  of  a concession  or  the  use  of  any  park  facility,  building,  trail,  road,  bridge,

bench, table or other park property for commercial purposes is prohibited unless a permit is issued by the Board of Trustees or their designated representative(s).  Such permit shall be clearly displayed by the person(s) seeking to conduct commercial activities within the park.  The permitting process will help to ensure that the Village is aware of the activity taking place within the park, that the proposed date/time/location does not conflict with the scheduled activities/events/operations, and that no harm is done to the landscape of the park.  In its review of the permit request, the Board of Trustees or its designated representative(s) should consider:

1. The risk of damage and injury as set forth in Sections 220.020(B)-(E);

2. The disruption of or conflict with the public's use and enjoyment of the park;

3. Whether the issuance of such permit may result in crowded or congested conditions due to the anticipated number of attendees for a planned event.

4. The nature of the requested activity, including whether such activity involves:

    a. the sale of products or items, which is prohibited unless it is a First Amendment protected activity;

    b. the use of furniture, tents (as that term is defined in Section 220.040(D)) or large "prop" amenities, which is prohibited; or

    c. the use of models or equipment.

5. The time and duration requested for such commercial purposes, including:

    a. Whether the activity will exceed one (1) hour;

    b. Whether the number of people involved exceeds ten (10); or

    c. Whether the time requested conflicts with a period of peak visitation to the park or other scheduled events, activities, or operations.

Any permit request involving less than ten (10) people, lasting for less than one (1) hour, and complying with the above, will be granted by the

3

Village Clerk/Controller or a designee.  All permit requests must be submitted at least forty-eight (48) hours before the proposed activities.  Any permit request involving more than ten (10) people, lasting more than one (1) hour, or otherwise conflicting with any of the above factors must be submitted at least fourteen (14) days in advance of the proposed activities so that the Board of Trustees may review the request and the permitted authority may be limited to certain designated areas.  Each permit issued by the Village shall only be effective on the date and time specified on the permit.  Specific permit fees shall be set by the Board of Trustees from time to time and shall be posted on the Village's website.

The fee for the permit at issue here was set at $100.  With the passage of this ordinance, Plaintiffs amended their complaint to challenge this version.  They claim that it impermissibly restricts their First Amendment freedom of expression and violates their due process rights under the Fifth and Fourteenth Amendments.  It is undisputed that taking commercial photographs in the Park without a permit would violate the ordinance and subject Plaintiffs to penalties of up to $1,000 in fines or 90 days in county jail pursuant to the Village Code's general penalty provision.

Plaintiffs maintain that the photography at issue is artistic expression of ideas such as love, harmony, and humor, both for commercial purposes and as an expression of Josephine Havlak's individual artistic motivation.  Plaintiffs assert that this expressive message is conveyed to an audience, namely the subject/owner and other subsequent viewers of the photographs, which are often posted on social media.  They assert that because of the threat of prosecution, they are refraining from engaging in commercial photography in the Park, and that even complying with the application process would chill their First Amendment speech.  Plaintiffs maintain that the ordinance is akin to a content-based regulation because it discriminates between commercial photographers and

amateur photographers, and does not apply to the Village itself which uses photographs of the Park on its website.

Although Plaintiffs recognize that safety and fair use of the Park for all users are legitimate government interests, Plaintiffs argue that the ordinance's restriction of commercial activity such as commercial photography has no relation to these interests. Plaintiffs assert that non-commercial and commercial photography are equally disruptive to public use of the Park, and that any distinction between the two is meaningless. Thus, according to Plaintiffs, Defendants have not met their burden to show that the ordinance serves a significant governmental interest because Defendants failed to articulate any harm exclusively caused by commercial activity.

Plaintiff also contend that the criteria for issuing a permit are too vague and render the ordinance unconstitutional. In particular, they point to three criteria the decision maker is to consider: disruption of the public's use and enjoyment of the Park, use of models or equipment, the sale of products or equipment. They further argue that the use-of- models-or-equipment criterion is content based and is not related to a compelling government interest. Plaintiffs argue that the Park is a unique and beautiful space, and that photographic artists have a right to decide the appropriate setting for their expressive works. Thus, in Plaintiffs' view, a different park is not an adequate alternative forum in which to take the desired photographs.

Plaintiffs seek declaratory judgment that the ordinance is unconstitutional, both facially and as applied to them, under the First and Fourteenth Amendments, and seek an order enjoining Defendants from enforcing the ordinance as to Plaintiffs.

Defendants argue that taking photographs for the private use of paying customers is not an activity covered by the First Amendment because the purpose is primarily commercial rather than expressive, and there is no message to a public audience. Assuming *arguendo* that Plaintiffs' activity at issue is covered by the First Amendment, Defendants assert that the challenged ordinance withstands constitutional scrutiny.  First, Defendants argue that Plaintiffs' activity combines both speech and non-speech elements, and is content neutral, and for each of these reasons, is subject to intermediate scrutiny; that is, the ordinance must be upheld so long as it is narrowly tailored to serve a significant government interest and leaves open ample alternatives for communication.

Defendants maintain that the Village has a significant interest in mitigating disruption of Park activities and ensuring the public is able to use the relatively small Park.  Defendants reason that the ordinance is narrowly tailored to serve these interests, since the ordinance instructs that when evaluating requests for permits, factors to be considered include disruption of public use of the Park, congestion, and crowd control. Defendants also maintain that Plaintiffs have ample alternative channels for their photographic expression, namely, a significant number of parks located in the greater St. Louis area that provide a similar stage for photographs.

**Evidentiary Hearing**

Five witnesses testified at the evidentiary hearing: Josephine Havlak; Ray Slama (Chair of the Village's Board of Trustees); Joel Marion and Scott Shy (two other commercial photographers who have used the Park for their photography); and Lisa Eisenhauer (a member of the Village's Board of Trustees).

6

Havlak testified that she has been a commercial portrait, wedding, and events photographer since 1979, and asserts that she is currently one of, if not the, premier such photographer in the area, setting tastes with her photography.   She described how she expresses herself through her photography and how the resulting photographs capture not just the likeness of the subjects, but something essential about their lives and who they are as individuals, assuring that they will not be "lost in the heap of history."   Havlak testified that her photographs are works of art in the same way that the portraits of the great American portrait painter, John Singer Sargent, are, and that she uses landscape to help "tell the story" of her subjects.  For example, she testified that a recent commercial photograph she took of a high school senior, admitted into evidence as Plaintiff's Exhibit 10(3), standing on the bridge in the Park hints to the subject's next stage in life.  Two other portraits of the same senior taken during the same shooting were also admitted into evidence.  Havlak testified that, like her, Sargent sold each of his portraits to the clients who commissioned him, and only later were the paintings hung in museums.

Havlak testified that since 2011, and particularly since 2014, there has been a movement across the country for governments to place restrictions, such as Ordinance No. 459, on commercial photography in public parks, restrictions she opposes and which she believes are "depriving mothers of their right not to have their child lost in the heap of history."  She testified that for many years, she used other area parks, such as the Missouri Botanical Garden, with backgrounds for her photographs that were "very similar in many ways" to those at Twin Oaks Park; only very recently did she use Twin Oaks Park for the first time.  But if permit schemes like Ordinance No. 459 are allowed,

she believes soon other parks would have similar restrictions, leaving commercial photographers with few options for unrestricted exercise of their First Amendment rights. She testified that she had never seen, or even heard of, squabbles between commercial photographers who might be at the same park site at the same time, and that she saw no need for the ordinance.

Haklak testified that having to get a permit in advance of a photo shoot in the Park would make it almost impossible for her to use the Park because sometimes she changes location at the last minute due to weather and lighting. She testified that a wedding party was most commonly comprised of about 15 people, although on occasion, there could be as many as 30 people, and that a shoot never lasted more than one hour. On cross examination, Havlak acknowledged that the high school senior in the photograph on the bridge, noted above, was standing on the outside of the guard rail of the bridge, having climbed over the rail to pose for the picture, at Havlak's direction. The evidence was undisputed that a fall from the bridge could cause serious injury. Havlak also admitted that the subject changed her clothes in the bushes in the Park for the different portraits Havlak took of her that day.

Havlak acknowledged that the Professional Photographers of America, a professional organization of which she was a member, has taken the position that a permitting process for commercial photography in public parks is appropriate.

Slama testified that the purpose of Ordinance No. 459 is to ensure that the Village is aware of activity taking place in the Park, so that proper planning and security can be arranged, and to ensure that no harm is done to the landscape. He explained that people

8

using the Park congregated primarily in the area of the bridge, favored also by commercial photographers.  He witnessed up to eight commercial photographers with wedding parties at the same time competing for space in this area, obstructing pathways, "taking over the gazebo," and placing subjects in dangerous places.  The perfect example of this last problem was Havlak placing the high school senior on the outside of the bridge's guard rail.  Slama testified that he also witnessed the subjects of commercial photographers using the Park's bathroom facilities to change clothes during a shoot, to the point where "they were taking over the restroom facilities," especially before 2014 when the facilities were enlarged.  He testified that he received complaints from other park users about congestion in the park due to the presence of commercial photographers and their subjects.

Slama described the decision-making process of the Board of Trustees in adopting Ordinance No. 459.  The Board wanted to balance the interests of the commercial photographers and the people wanting their photographs taken in the Park, with the interests of the other patrons of the Park enjoying it per its intended use.  The amount of $100 for the permit fee was arrived at by canvassing other such ordinances, and in light of the cost of approximately $100 for having a police officer at the Park for about two to three hours.  Slama explained that the Village had an annual contract with St. Louis County to pay for one county police officer to work for the Village 40 hours a week, Monday through Friday.  It is the Village's policy when a commercial activity permit is granted, to have the officer at the Park for the time in question; if the activity was scheduled for a Saturday or Sunday, which was often the case with commercial

photographers, the Village would pay the officer separately at $35 per hour (or if he were not available, would hire a different officer).  The Board did not discuss the impact the fee would have on individual photographers.  The Board did consider not requiring a permit for smaller groups of three to four people, but realized that multiple smaller groups would pose similar problems as one large group.

Slama testified that the Board directed the Village Clerk to grant permits meeting the conditions in the ordinance, and explained that the 14-day advance notice requirement was to allow the Board, which met every other Monday or Wednesday, to review an application, when necessary, under the ordinance.

Marion, a professional photographer since 1971, testified that in the past, he used Twin Oaks Park three or four times a week in seasonal times, but now the $100 fee per session was prohibitive for him and his customers, and so he goes to other parks for his outdoor shoots.  Marion's testimony comported with Havlak's with respect to the need for spontaneity due to weather, and with respect to never having experienced squabbles with other photographers or users of a park.  Like Havlak, Marion believed his photography was a form of artistic expression.  He believed that a policy requiring a permit at a yearly fee, for use of the park anytime, would have the advantage of keeping nonprofessional photographers out.  Marion did not understand how there was a correlation between the $100 fee and any cost to the Village due to a commercial photographer using the Park.

Contrary to Havlak's and Marion's testimony, Shy, also a commercial photographer, testified that he experienced conflicts between commercial photographers

and the general public in the Park, and described one occasion when over six photographers and their subjects were in the area near the bridge and "took over."   He also realized he was in the way of "the foot traffic" in the Park during his photography sessions, noting that professional photographers tend to get very focused on their work when they are attempting to capture the proper shots.  Shy believed that Ordinance No. 459 was a fair way to deal with the competing interests, and that the $100 fee may be fair, although it deters him from using the Park.   Like Havlak and Marion, Shy considered himself a creative artist insofar as his photography was concerned.

Eisenhauer testified that as the mother of three young children, she frequently went to the Park and, especially on weekends, regularly encountered three or four commercial photographers and their groups of subjects, whose presence made it difficult, for example, to walk a lap around the lake because they would be in the way.  She stated that Park users would not want to bring their bikes to the Park because they could not get through on the paths, due to professional photographers setting up equipment and taking photographs of a group.  Eisenhaur testified that going into a professional photographer's space was inhibiting, and that the issues posed by other walkers or amateur photographers were different because they were easy to maneuver around or might break for you.

Eisenhauer recounted an instance when she was in the Park in the fall of 2013 at a family gathering that was disturbed by a commercial photographer who set up bales of hay nearby as props and took photographs of one family after another for several hours. She testified that like Slama, she saw the subjects of professional photographers using the Park's bathroom facilities for changing clothes.  She confirmed that she had seen

commercial photographers using large circular reflectors, as depicted in Defendants'
Exhibit D.

Eisenhauer then described the process leading to the passage of Ordinance No.
459 and its precursor.  In the summer of 2013, when the ban on commercial activity was
in place, a commercial photographer (purportedly representing himself and Marion)
approached the Board of Trustees and suggested a permitting process rather than a ban,
believing such a process would limit amateur photographers whom he believed were the
problem.  At about the same time, the ACLU contacted the Board and expressed concern
that the ban, as it affected commercial photographers, might be violative of the First
Amendment.   Eisenhaurer and another member of the Board met with two ACLU
representatives at the Park.  According to Eisenhouer, after the ACLU representatives
saw the situation at the Park, the Board received no further communication from the
ACLU.  The Board began looking at all options for balancing the competing interests at
issue, such as a permitting process for commercial photographers only on weekends, or
only for larger groups.  But none of these options addressed all the problems that arose
from commercial photographers attempting to take photographs of people within the
small, confined area that conflicted with other Park users.  These options also did not
address the safety concern evidenced by Havlak having placed a subject on the outside of
the railing of the bridge.

Eisenhauer testified that she was involved in the decision to set the fee for a permit
at $100, and that there was a "direct correlation" between this amount and the cost
incurred by the Village due to use of the Park by commercial photographers.

Defendants entered into evidence copies of nine ordinances or written policies from municipalities/cities across the county, for use of a public park for wedding and event commercial photography, requiring a permit that ranged in cost from $35 to $260, to $400 for an annual pass; and not mentioning advance notice, or requiring advance notice of 10 business days to 14 days.  (Exs. to Doc. No. 63.)  Defendants also admitted into evidence an undated article of the Professional Photographers of America that discusses obtaining a permit for commercial photography on public lands, and advises photographers to check on permit requirements, to pay any applicable fees, and in the case of small parks, to be sure to apply for a permit early to guarantee use of the space.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Is Protected Speech Involved?

The First Amendment, applied to the states through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech."  U.S. CONST. amend. I.  For purposes of First Amendment coverage, "the Constitution looks beyond written or spoken words as mediums of expression," *Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995), extending its protection to include, inter alia, "pictures, films, paintings, drawings, and engravings," *Kaplan v. California*, 413 U.S. 115, 119-20 (1973).  In *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), the Supreme Court explained as follows:

> It goes without saying that artistic expression lies within this First Amendment protection.   The constitutional protection of artistic works turns not on the political significance that may be attributable to such productions, though they may indeed comment on the political, but simply on their expressive character, which falls within a spectrum of protected

> "speech" extending outward from the core of overtly political declarations.
> Put differently, art is entitled to full protection because our "cultural life,"
> just like our native politics, rests upon the ideal of governmental viewpoint
> neutrality.

*Finley*, 524 U.S. at 602 (footnote & citations omitted).  Moreover, "the degree of First

Amendment protection" to which speech is entitled "is not diminished merely because

the . . . speech is sold rather than given away."  *City of Lakewood v. Plain Dealer Pub.*

*Co.*, 486 U.S. 750, 756 n.5 (1988); *see also Mastrovincenzo v. City of New York*, 435

F.3d 78, 92 (2d Cir. 2006).

To achieve First Amendment protection, a plaintiff must show that he or she

possessed: (1) a message to be communicated; and (2) an audience to receive that

message, regardless of the medium in which the message is to be expressed.  *Hurley*, 515

U.S. at 568.  But, "a narrow, succinctly articulable message is not a condition of

constitutional protection, which if confined to expressions conveying a 'particularized

message,' . . . would never reach the unquestionably shielded painting of Jackson

Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll."  *Id*. at

569; *see also Kaahumanu v. Hawaii*, 682 F.3d 789, 799 (9th Cir. 2012) (holding that

wedding ceremonies are protected expression under the First Amendment); *White v. City*

*of Sparks*, 500 F.3d 953, 957 (9th Cir. 2007) (holding that an artist's sale of his original

paintings "which communicate his vision of the sanctity of nature" constituted protected

speech).

"Although it is common to place the burden upon the Government to justify

impingements on First Amendment interests, it is the obligation of the person desiring to

14

engage in assertedly expressive conduct to demonstrate that the First Amendment even
applies." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).

Defendants cite three cases which suggest that taking commissioned photographs
intended for private use is not an expressive activity covered by the First Amendment:
*Porat v. Lincoln Towers Community Association*, No. 04 Civ. 3199 (LAP), 2005 WL
646093 (S.D.N.Y. Mar. 21, 2005); *Larsen v. Fort Wayne Police Department*, 825 F.
Supp. 2d 965, 979 (N.D. Ind. 2010); and *State v. Chepilko*, 965 A.2d 190, 199 (N.J.
Super. Ct. App. Div. 2009). *Porat* held that an individual's "purely private recreational,
non-communicative photography" of buildings under construction was not protected
under the First Amendment because the self-proclaimed "photo hobbyist" did not have a
communicative purpose or any intended audience for his photos. 2005 WL 646093, at
*4-5. *Larsen* concluded that a father's videotaping of his daughter's school performance
for "personal archival purposes" and "family documentation" also did not qualify for
First Amendment protection. 825 F. Supp. 2d at 980. And *Chepilko* reasoned that the
taking of photographs of people walking on the boardwalk and offering the photographs
for sale to the subjects was not entitled to First Amendment protection because the
conduct did not serve "predominantly expressive purposes." 965 A.2d at 202.

Other authority would suggest that Plaintiffs' photographic activity is covered by
the First Amendment. *See Bery v. City of New York*, 97 F.3d 689, 696 (2d Cir. 1996)
(holding that paintings, photographs, prints, and sculptures, are visual forms of art that
"always communicate some idea or concept" and are therefore presumptively covered by
the First Amendment); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th

15

Cir. 2010) (holding at summary judgment stage that tattoos and the process of tattooing are "expressive activity fully protected by the First Amendment"; "tattoos can express a countless variety of messages and serve a wide variety of functions including decorative; religious; . . . and as an indication of identity") (citation omitted).

The Court need not resolve this question, however, because the Court concludes that even if Plaintiffs met their burden of showing that the First Amendment applies to their conduct at issue in this case, Ordinance No. 459 is constitutional.

## Constitutionally of Ordinance No. 459

Parks are traditional public forums, historically associated with the free exercise of expressive activities, *United States v. Grace*, 461 U.S. 171, 177 (1983), and Ordinance No. 459 requiring a permit to engage in commercial photography in the Park is a prior restraint on such conduct, carrying a "heavy presumption" against the Ordinance's validity, *see Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Nevertheless, the Supreme Court has recognized that "government, in order to regulate competing uses of public forums, may impose a permit requirement on those wishing to" engage in protected speech in that forum.  *Id*. at 130; *see also Thomas v. Chic. Park Dist*., 534 U.S. 316, 322 (2002) ("Regulations of the use of a public forum that ensure the safety and convenience of the people are not 'inconsistent with civil liberties but . . . [are] one of the means of safeguarding the good order upon which [civil liberties] ultimately depend.'") (quoting *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941)).

> Such a [permit] scheme, however, must meet certain constitutional requirements.  It may not delegate overly broad licensing discretion to a government official.  Further, any permit scheme controlling the time,

place, and manner of speech must not be based on the content of the
message, must be narrowly tailored to serve a significant governmental
interest, and must leave open ample alternatives for communication.

*Forsyth Cty., Ga.*, 505 U.S. at 130; *see also Douglas v. Brownell*, 88 F.3d 1511, 1521

(8th Cir. 1996); *Pence v. City of St. Louis, Mo.*, 958 F. Supp. 2d 1079, 1083 (E.D. Mo.

2013).

 "Content-based laws—those that target speech based on its communicative

content—are presumptively unconstitutional and may be justified only if the government

proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town*

*of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015).  In contrast, content-neutral regulation of

speech is subject to a lower, intermediate, standard of scrutiny.   Such regulation survives

First Amendment scrutiny if it is "'narrowly tailored to serve a significant governmental

interest'" and allows for "'ample alternative channels for communication.'" *Phelps-*

*Roper v. City of Manchester, Mo.*, 697 F.3d 678, 686 (8th Cir. 2012) (quoting *Ward v.*

*Rock Against Racism*, 491 U.S. 781, 791 (1989)).

 "Government regulation of speech is content based if a law applies to particular

speech because of the topic discussed or the idea or message expressed," or if a law,

though content neutral on its face, "cannot be justified without reference to the content of

the regulated speech," or was "adopted by the government because of disagreement with

the message the speech conveys." *Reed*, 134 S. Ct. at 2227.   "For example, a law

banning the use of sound trucks for political speech—and only political speech—would

be a content-based regulation, even if it imposed no limits on the political viewpoints that

could be expressed." *Id.* at 2230.

Here, the Court finds unpersuasive Plaintiffs' argument that the fact that amateur photography in the Park, and photography by the Village itself in the Park, are not regulated makes Ordinance No. 459 akin to a content-based permit scheme.  In treating commercial and amateur photographers differently, the ordinance in no way reflects a "content preference," and can be justified without reference to the content of the regulated conduct.   Rather, the evidence shows that the different treatment here is based on different levels of interference with use and enjoyment of the Park by all.  The evidence shows that commercial photographers' sessions last for longer periods of time, use more large equipment, are more intrusive, and likely involve more subjects in one group, than amateur photographers' photographing conduct.  *Cf. id*. at 2230-31 (holding that a town's signage code was content based because it singled out specific subject matter for differential treatment, even if it did not target viewpoints within that subject matter).  Thus, the Court applies intermediate scrutiny to Ordinance No. 459.

The Court concludes that the Ordinance is narrowly tailored to serve significant government interests.  The requirement that the regulation be narrowly tailored "does not mean that it need be the least restrictive or least intrusive means of" serving a significant government interest; rather, "the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."  *Ward*, 491 U.S. at 798-99 (citation omitted); *see also Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1038 (9th Cir. 2006).

Given the size and configuration of the area of the Park that Plaintiffs and other commercial photographers wish to use for their photography, the Village has a significant interest in coordinating when and how many commercial photographers use the Park at any given time.  The Court credits the testimony of Slama and Eisenhauer that professional photographers and their subjects would often block other Park users from enjoying the bridge and nearby areas of the Park.  The task faced by the Village here is much like the task of the Park District in *Thomas,* 534 U.S. 316.   In upholding a content-neutral permit scheme requiring individuals to obtain a permit before conducting more-than-50-person events in municipal parks, the Supreme Court wrote:

> [T]he object of the permit system . . . is not to exclude communication of a particular content, but to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event.

*Id*. at 322.

### $100 Fee Requirement

Generally, the government may not tax the exercise of a constitutionally protected right.  *Ne. Ohio Coalition for the Homeless v. City of Cleveland*, 105 F.3d 1107, 1109 (6th Cir. 1997).  Nevertheless, "an ordinance requiring a person to pay a license or permit fee before he can engage in a constitutionally protected activity does not violate the Constitution so long as the purpose of charging the fee is limited to defraying expenses incurred in furtherance of a legitimate state interest."  *Id*. at 1109-10.  Such a fee is not excessive, even if it is more than nominal, where the fee is imposed "to meet the expense incident to the administration of the [statute requiring a license for engaging in protected

19

activity] and to the maintenance of public order in the matter licensed." *Cox*, 312 U.S. at 577.

Demonstrating the relationship of the permit fee and its legitimate purpose "does not present a high evidentiary hurdle." *Parks v. Finan*, No. C2-03-94, 2003 WL 23412981, at *11 (S.D. Ohio June 4, 2003), *aff'd*, 385 F.3d 694 (6th Cir. 2004). Here the fee correlates to the expenses incurred for an officer, and Defendants have presented sufficient credible evidence that the amount of the permit fee is reasonably related to the legitimate goal of assuring the safety and enjoyment of the Park by all its users. *See Sullivan v. City of Augusta*, 511 F.3d 16, 35 (1st Cir. 2007) (the provision of a city's parade ordinance requiring a permit that cost $100, plus the costs of traffic control per city collective bargaining agreement and clean-up, was a reasonable time, place and manner restriction); *The Nationalist Movement v. City of York*, 481 F.3d 178, 183 (3d Cir. 2007) (holding that a permit fee of $50 for residents and $100 for non-residents for conducting an event involving more than 25 people on public land was reasonable). The Court notes that the amount of the fee is not variable, so the danger of discretionary abuse by the permitting authority is absent. *See Sullivan, 511 F.3d at 35-36; The Nationalist Movement*, 481 F.3d at 183.

**Discretion and Standards**

"[E]ven content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression. Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." *Thomas*, 534 U.S. at 323. Thus a

regulation must "contain adequate standards to guide the official's decision . . . ."  *Id*.

Here, the Court concludes that the criteria set forth in Ordinance No. 459 to guide the

determination of whether to grant a permit, including the three criteria specifically

challenged by Plaintiffs, as noted above, are reasonably specific and objective, and do not

leave the decision "to the whim of the administrator."  Nor do they allow for the

consideration of the content of the expression involved.  *See id*. (upholding an ordinance

providing that the park district "may" deny a permit, required for conducting a more-

than-50 person event in a municipal park, when, among other things, a permit had been

granted to an earlier applicant for the same time and place, or when the intended use

would present an unreasonable danger to the safety of park users and grounds); *Douglas*

*v. Brownell*, 88 F.3d 1511, 1523 (8th Cir. 1996) (holding that a parade ordinance that

required the chief of police to issue a permit unless the time, route, or size of a parade

would disrupt use of a street ordinarily subject to significant congestion or traffic, did not

give the chief of police too much discretion in violation of First Amendment; the

exception was based on objective factors and did not allow the chief of police to consider

the content or purpose of a parade).

The Court notes that a content-neutral permitting ordinance "need not include

either a deadline for consideration by the governing body or a provision for prompt

judicial review."  *S. Or. Barter Fair v. Jackson Cty., Or*., 372 F.3d 1128, 1138 (9th Cir.

2002); *see also Granite State Outdoor Advert., Inc. v. City of St. Petersburg*, 348 F.3d

1278, 1281–83 (11th Cir. 2003) (holding that absence of time limits for municipality to

process permit applications does not render content-neutral sign ordinance unconstitutional).

## **Alternative Channels of Communication**

*Kaahumanu v. Hawaii*, 682 F.3d 789, cited by Defendants, supports the proposition they advance—that the fact that there are other public parks in the St. Louis area, if not in the Village, that offer attractive landscape for outdoor wedding and portrait photography satisfies the ample-alternative-channels requirement to pass intermediate-level scrutiny.  In *Kaahumanu*, the Ninth Circuit examined regulations that required a permit, at a cost based on the amount of space desired, in order to hold commercial weddings on Hawaii's public beaches.  Commercial weddings were defined as weddings which had any component that involved the receipt of compensation for services or goods, other than the services of a photographer, even if the only person paid was a minister, priest, rabbi, or other religious person.  The court had "no difficulty" concluding that such wedding ceremonies were protected expression under the First Amendment. But the Court concluded that, with one exception not relevant here, the regulations did not violate the First Amendment because they were narrowly tailored to serve the significant governmental interest in not allowing such weddings to interfere unduly with activities of other beachgoers, the limitations were content neutral, the government had a significant interest in regulating land uses of state beaches, and there were ample alternative channels for beach weddings.  With respect to the issue of ample alternative channels, the Ninth Circuit reasoned as follows:

> The "entire medium" of a beach wedding is clearly not foreclosed.  A
> person need not obtain a permit to conduct a commercial beach or beach-
> related wedding on sites other than a state beach.  These alternative sites
> include county beaches or private property next to any beach.

682 F.3d at 805; *see also United States v. Nenninger*, 351 F.3d 340, 346 (8th Cir. 2003)

("[T]he regulations leave ample alternative channels for expressive activity.  If the

Rainbow Family wishes to avoid the special-use authorization requirement, they may

hold their gatherings on private property or other lands.  If they wish to gather en masse

in the National Forests, they must obtain a special-use authorization.").

Based on this authority, in the context of this case, where commercial

photographers (1) may use Twin Village Park by obtaining a permit, and (2) have

available, as the evidence established, numerous other parks in the area with landscapes

that would allow for the photographers' full artistic expression, such as the parks Havlak

herself testified she used over the years, the Court concludes that Ordinance No. 459

satisfies the ample-alternative-channels requirement.  "The First Amendment . . . does not

guarantee [speakers] access to every or even the best channels or locations for their

expression."  *Care-Reid v. Metro. Transp. Auth*., 903 F.2d 914, 919 (2d Cir. 1990).

**48 Hour / 14 Day Advance Application Requirement**

The Court concludes that the evidence that on some rare occasions commercial

photographers may change, at the last minute, the location of a session set with their

customers, does not render unconstitutional the advance application provision of

Ordinance No. 459 for obtaining a permit (48 hours, unless activity involves more than

ten people or lasts more than one hour, or conflicts with any of the factors listed in the

ordinance to be considered by the decision maker, in which cases, 14 days). The situation at issue here is quite different from classic First Amendment activity such as political protests where spontaneity is crucial. *See, e.g., Douglas*, 88 F.3d at 1523 ("Timing is of the essence in politics . . . . [W]hen an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all.") (citation omitted).

Here, where the time for the protected expression is almost always planned in advance, the Court believes that having to provide the Village with 48 hours advance notice, and, at the most, 14 days advance notice, is reasonable in order to allow the Village fair opportunity to review an application, and is not an undue burden on Plaintiffs' First Amendment rights. *See, e.g., CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1281 (11th Cir. 2006) (upholding a 90-day advance application requirement in content-neutral ordinance requiring a permit to hold an outdoor festival in the city).

## CONCLUSION

In sum the Court concludes that to the extent Ordinance No. 459 applies to protected expressive activity engaged in by Plaintiffs, the ordinance is content neutral, and does not violate the First Amendment.

Accordingly,

**IT IS HEREBY ORDERED** that declaratory judgment is entered in favor of Defendants and against Plaintiffs, and Plaintiffs' request for permanent injunctive relief is denied.

24

A separate Judgment shall accompany this Memorandum Opinion.


AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 14th day of July, 2016.